**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE JOSEPH A. LAROSKI, JR., JUDGE

| | |
|---|---|
| DEER PARK GLYCINE, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Court No. 23-00238 |
| | ) |
| UNITED STATES, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S**
<u>**MOTION FOR JUDGMENT ON THE AGENCY RECORD**</u>

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

CLAUDIA BURKE
Deputy Director

OF COUNSEL:
JOSEPH GROSSMAN-TRAWICK
Attorney
Office of the Chief Counsel
    for Trade Enforcement & Compliance
U.S. Department of Commerce
Washington, D.C.
Tel: (202) 365-7536
Email: Joseph.Grossman-Trawick@trade.gov

KELLY GEDDES
U.S. Department of Justice
Commercial Litigation Branch
P.O. Box 480, Ben Franklin Station
Washington, DC 20044
Tel: (202) 307-2867
Email: Kelly.Geddes2@usdoj.gov

August 9, 2024

*Attorneys for Defendant*

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE JOSEPH A. LAROSKI, JR., JUDGE

_____

|  |  |
|---|---|
| DEER PARK GLYCINE, LLC, | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | )    Court No. 23-00238 |
|  | ) |
| UNITED STATES, | ) |
|  | ) |
| Defendant. | ) |

_____

## <u>ORDER</u>

Upon consideration of the motion for judgment upon the administrative record filed by plaintiff, responses thereto, plaintiff's reply, the administrative record, and all other pertinent papers, it is hereby

ORDERED that plaintiff's motion is DENIED;

ORDERED that the Department of Commerce's determination is sustained; and it is further

ORDERED that judgment is entered in favor of the United States.

_____

JUDGE

Dated: _____

# **TABLE OF CONTENTS**

STATEMENT PURSUANT TO RULE 56.2 ................................................................................. 1

    I.    The Administrative Determination Under Review ................................................. 1

    II.    Issues Presented For Review ................................................................................. 2

STATEMENT OF FACTS ....................................................................................................... 2

    I.    The Antidumping and Countervailing Duty Orders ............................................. 2

    II.    Description Of Calcium Glycinate ........................................................................ 3

    III.    Scope Proceeding .................................................................................................. 3

SUMMARY OF THE ARGUMENT ....................................................................................... 4

ARGUMENT ........................................................................................................................... 5

    I.    Standard Of Review .............................................................................................. 5

    II.    Legal Framework For Scope Rulings .................................................................... 7

    III.    Commerce's Scope Determination Is Supported By Substantial Evidence And In Accordance With Law ......................................................................................... 8

    IV.    Commerce's Interpretation Of The Term "Precursor" Is Reasonable ................. 10

    V.    Commerce Did Not Unreasonably Limit "Precursors" To Only Glycine Slurry . 15

    VI.    The Scope Determination Complies with Commerce's Regulations ................... 17

CONCLUSION ....................................................................................................................... 20

# <u>TABLE OF AUTHORITIES</u>

## <u>Cases</u>

*Am. Silicon Techs. v. United States*, 261 F.3d 1371 (Fed. Cir. 2001)............................................. 6

*Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374 (Fed. Cir. 2009) ...................... 11, 16, 19

*Boomerang Tube LLC v. United States*, 856 F.3d 908 (Fed. Cir. 2017)...................................... 11

*Consol. Edison v. NLRB*, 305 U.S. 197 (1938)............................................................................. 5

*Corus Staal BV v. Dep't of Commerce*, 395 F.3d 1343 (Fed. Cir. 2005) ................................ 5, 11

*Crawfish Processors Alliance v. United States*, 483 F.3d 1358 (Fed. Cir. 2007)......................... 5

*Duferco Steel, Inc. v. United States*, 296 F.3d 1087 (Fed. Cir. 2002) ........................................... 6

*Eckstrom Indus., Inc. v. United States*, 254 F.3d 1068 (Fed. Cir. 2001) ...................................... 7

*Ericsson GE Mobile Communications, Inc. v. United States*, 60 F.3d 778 (Fed. Cir. 1995) ......... 6

*Fedmet Resources Corp. v. United States*, 755 F.3d 912 (Fed. Cir. 2014).................................. 6, 8

*Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034 (Fed. Cir. 1996) .................................................. 6

*Gerber Food (Yunnan) Co. v. United States*, 601 F. Supp. 2d 1370 (Ct. Int'l Trade 2009)......... 12

*Global Commodity Group LLC v. United States*, 709 F.3d 1134 (Fed. Cir. 2013) ....................... 6

*Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323 (Ct. Int'l Trade 2006)..................... 6

*King Supply Co. LLC v. United States*, 674 F.3d 1343 (Fed. Cir. 2012) ....................................... 6

*Meridian Prod., LLC v. United States*, 851 F.3d 1375 (Fed. Cir. 2017) .................................. 7, 8

*Mid Continent Nail Corp. v. United States*, 725 F.3d 1295 (Fed. Cir. 2013) ............................... 6

*Res. Corp. v. United States*, 755 F.3d 912 (Fed. Cir. 2014) ........................................................ 8

*Sandvik Steel Co. v. United States*, 164 F.3d 596 (Fed. Cir. 1998) .............................................. 6

*Sango Int'l L.P. v. United States*, 484 F.3d 1371 (Fed. Cir. 2007)................................................ 5

*See Shandong Huarong Mach. Co.*, 435 F. Supp. 2d 1261 (Ct. Int'l Trade 2006)....................... 11

*Shenyang Yuanda Aluminum Indus. Eng'g Co. v. United States*, 776 F.3d 1351 (Fed. Cir. 2015) 7

*Stanley Works (Langfang) Fastening Systems Co. v. United States*, 279 F. Supp. 3d 1172 (Ct. Int'l Trade 2017) ...................................................................................................... 14

*Star Pipe Products*, 365 F. Supp. 3d 1277 (Ct. Int'l Trade 2019) .................................... 13, 15, 18

*Ta Chen Stainless Steel Pipe v. United States*, 342 F. Supp. 2d 1191 (Ct. Int'l Trade 2004) ...... 11

*Tak Fat Trading Co. v. United States*, 396 F.3d 1378 (Fed. Cir. 2005) ......................................... 8

*United Steel & Fasteners, Inc. v. United States*, 947 F.3d 794 (Fed. Cir. 2020) .......................... 8

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) ............................................................. 5

*Walgreen Co. of Deerfield v. United States*, 620 F.3d 1350 (Fed. Cir. 2010) .............................. 6

*Wheatland Tube Co. v. United States*, 161 F.3d 1365 (Fed. Cir. 1998) ........................................ 7

### Statutes

19 U.S.C. § 1516a ...................................................................................................................... 5

19 U.S.C. § 1673e ....................................................................................................................... 7

28 U.S.C. § 2637 ....................................................................................................................... 11

### Regulations

19 C.F.R. § 351.225 ............................................................................................................ passim

### Administrative Determinations

*Final Partial Affirmative Determination of Circumvention pertaining to the Antidumping Duty Order on Glycine from China,* 77 Fed. Reg. 73,426 (Dep't of Commerce Dec. 10, 2012) ..... 19

*Glycine from China, India, and Japan*, Investigation Nos. 701-TA-603-604 and 731-TA-1413-1414 (Final), USITC Pub. 4900 (June 2019) (ITC Report) ............................................ passim

*Glycine from India and Japan: Amended Final Affirmative Antidumping Duty Determination and Antidumping Duty Orders*, 84 Fed. Reg. 29,170 (Dep't of Commerce Jun. 21, 2019) ............. 2

*Glycine from India and the People's Republic of China: Countervailing Duty Orders*, 84 Fed. Reg. 29,173 (Dep't of Commerce Jun. 21, 2019) ...................................................................... 2

*Glycine From India, Japan, and Korea* Investigation Nos. 731–TA–1111-1113 (Preliminary), USITC Pub. 3921 (May 2007) ............................................................................................... 16

*Glycine from Thailand: Antidumping Duty Order*, 84 Fed. Reg. 55,912 (Dep't of Commerce Oct. 18, 2019) ................................................................................................................................ 2

*Regulations To Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws,* 85 Fed. Reg. 49,472 (Dep't of Commerce Aug. 13, 2020) ................................... 10

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE JOSEPH A. LAROSKI, JR., JUDGE

_____
                                          )
DEER PARK GLYCINE, LLC,                   )
                                          )
                 Plaintiff,               )
                                          )
        v.                                )      Court No. 23-00238
                                          )
UNITED STATES,                            )
                                          )
                 Defendant.               )
                                          )
_____ )

**DEFENDANT'S RESPONSE TO PLAINTIFF'S
MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of this Court, defendant, the United States, respectfully submits this response to the motion for judgment on the agency record (Pl. Br.) (ECF No. 24) filed by plaintiff, Deer Park Glycine, LLC (Deer Park). Deer Park challenges the U.S. Department of Commerce's final scope ruling finding that calcium glycinate is not subject to the antidumping duty (AD) orders on glycine from India, Japan, and Thailand and the countervailing duty (CVD) orders on glycine from India and the People's Republic of China (China). As demonstrated below, Commerce's scope ruling is supported by substantial evidence and otherwise in accordance with law. Accordingly, Commerce's scope ruling should be sustained.

**STATEMENT PURSUANT TO RULE 56.2**

**I.     The Administrative Determination Under Review**

Deer Park challenges the final scope ruling issued on October 11, 2023, concerning the AD orders on glycine from India, Japan, and Thailand and the CVD orders on glycine from India

and China.  *See Glycine from India, Japan, Thailand, and the People's Republic of China:*

*Scope Ruling on Calcium Glycinate* (October 11, 2023) (Final Scope Ruling) (P.R. 9).[1]

## II.    <u>Issues Presented For Review</u>

1.    Whether Commerce's determination that calcium glycinate is not subject to the

AD orders on glycine from India, Japan, and Thailand and the CVD orders on glycine from India

and China is supported by substantial evidence and in accordance with law.

## <u>STATEMENT OF FACTS</u>

## I.    <u>The Antidumping and Countervailing Duty Orders</u>

Commerce has published AD and CVD orders covering glycine from certain countries.

*See Glycine from India and Japan: Amended Final Affirmative Antidumping Duty Determination*

*and Antidumping Duty Orders*, 84 Fed. Reg. 29,170 (Dep't of Commerce Jun. 21, 2019); *Glycine*

*from Thailand: Antidumping Duty Order*, 84 Fed. Reg. 55,912 (Dep't of Commerce Oct. 18,

2019); and *Glycine from India and the People's Republic of China: Countervailing Duty Orders*,

84 Fed. Reg. 29,173 (Dep't of Commerce Jun. 21, 2019) (collectively, the Orders).  Commerce

defined the scope of the Orders, in relevant part, as follows:

> The merchandise covered by these orders is glycine at any purity
> level or grade.  This includes glycine of all purity levels, which
> covers all forms of crude or technical glycine including, but not
> limited to, sodium glycinate, glycine slurry and any other forms of
> amino acetic acid or glycine.  Subject merchandise also includes
> glycine and precursors of dried crystalline glycine that are
> processed in a third country, including, but not limited to, refining
> or any other processing that would not otherwise remove the
> merchandise from the scope of these orders if performed in the

---

[1] Citations to the public record (P.R.) refer to the record of the underlying scope inquiry.  *See* Administrative Record Index (ECF No. 15).  This brief does not contain any confidential information.  Because the determination at issue applied to four different AD and CVD orders, the United States filed four identical administrative records corresponding to four identical decisions.  For convenience, we refer to this as a singular administrative record and determination.

country of manufacture of the in-scope glycine or precursors of
dried crystalline glycine.

84 Fed. Reg. at 29,172 (AD order for India and Japan); 84 Fed. Reg. at 55,913 (AD order for

Thailand); 84 Fed. Reg. at 29,174 (CVD order for India and China).

## II.     Description Of Calcium Glycinate

The challenged scope ruling, issued in response to a scope ruling application by domestic

party GEO Specialty Chemicals, Inc. (GEO)[2], concerns calcium glycinate.  As GEO explained in

its scope ruling application, calcium glycinate results from "the chelation" (a type of bonding)

"of calcium and glycinate."  GEO's Letter, "Scope Ruling Application" (Aug. 14, 2023) (P.R. 1)

(Scope Ruling Application).  GEO further explained, "Glycine can be retrieved from calcium

glycinate when the product is deconstructed. . . . Thus, when used in the production of glycine,

calcium glycinate is a precursor of glycine."  *Id.*  Calcium glycinate can be converted into

glycine slurry, and subsequently, dried crystalline glycine, after multiple production steps and

chemicals processes.  Final Scope Ruling at 4-5.

## III.     Scope Proceeding

On August 14, 2023, GEO filed its scope ruling application pursuant to 19 C.F.R.

§ 351.225(c), requesting that Commerce determine that calcium glycinate is covered by the

scope of the Orders.  *See* Scope Ruling Application.

On August 30, 2023, Commerce initiated a scope inquiry and invited interested parties,

other than GEO, to submit comments and certain factual information.  *See* Commerce's Letter,

"Glycine from India, Japan, Thailand, and the People's Republic of China:  Initiation of Scope

---

[2]  Deer Park, a subsidiary of GEO, has taken over GEO's glycine business and has assumed
GEO's action challenging the Final Scope Ruling.  *See* ECF No. 14.

Inquiry on Calcium Glycinate" (Aug. 30, 2023) (P.R. 8).  No interested party submitted

comments.  Final Scope Ruling at 2.

In the final scope ruling issued on October 11, 2023, Commerce determined that calcium

glycinate is not within the scope of the Orders.  *Id*. at 4-5.  To reach this conclusion, Commerce

considered the scope language; the International Trade Commission (ITC) Report of the

underlying investigation, which is a primary interpretive source under 19 C.F.R. § 351.225(k)(1);

and the description of calcium glycinate included in the scope ruling application.  *Id.*  The Orders

cover glycine slurry as well as other precursors of dried crystalline glycine, but the scope

language does not include precursors of glycine slurry or precursors of glycine generally.  *See* 84

Fed. Reg. at 29,172; 84 Fed. Reg. at 55,913; 84 Fed. Reg. at 29,174.  The ITC Report explains

that glycine slurry is a precursor of dried crystalline glycine, and the scope ruling application

explains that calcium glycinate must be converted into glycine slurry before it can be converted

into dried crystalline glycine.  *Id*. at 4 (quoting *Glycine from China, India, and Japan*,

Investigation Nos. 701-TA-603-604 and 731-TA-1413-1414 (Final), USITC Pub. 4900 (June

2019) (ITC Report) at IV-1, n.4; Scope Ruling Application at Exhibit 6).  Commerce concluded

that, "{b}ecause calcium glycinate has to be processed into glycine slurry first through multiple

production steps and chemical processes, before glycine slurry is turned into dried crystalline

glycine . . . calcium glycine is not a precursor of dried crystalline glycine."  *Id*. at 5.  Commerce

therefore concluded that calcium glycine is not within the scope of the Orders.  *Id.*

## SUMMARY OF THE ARGUMENT

The Court should sustain Commerce's final scope ruling because it is supported by

substantial record evidence and in accordance with law.  This Court should reject Deer Park's

efforts to introduce extra-record evidence and advance new arguments on appeal that were not

presented to Commerce during the administrative proceeding.

Consistent with its regulations, Commerce considered the Orders' scope language, the ITC investigation report, and record evidence describing calcium glycinate to determine that calcium glycinate is not covered by the Orders. Commerce reasonably interpreted "precursors of dried crystalline glycine" not to include a substance that had to go through numerous stages of processing before it could yield dried crystalline glycine. In doing so, Commerce did not unlawfully restrict the scope of the Orders, nor did it interpret the scope of the Orders contrary to its language. Finally, Commerce did not err in declining to consider additional sources cited by Deer Park, particularly because GEO failed to cite those sources in its scope ruling application in support of its claim that calcium glycinate is within the scope of the Orders.

## ARGUMENT

### I.    Standard Of Review

The Court may review a determination by Commerce as to "whether a particular type of merchandise is within the class or kind of merchandise described in an existing finding of dumping or antidumping or countervailing duty order." 19 U.S.C. § 1516a(a)(2)(B)(vi). Such a "class or kind" determination is known as a "scope ruling." 19 C.F.R. § 351.225. In reviewing Commerce's scope determinations, the court "must uphold a scope ruling unless {it finds the ruling} to be 'unsupported by substantial evidence on the record or otherwise not in accordance with law.'" *Sango Int'l L.P. v. United States*, 484 F.3d 1371, 1378 (Fed. Cir. 2007) (quoting 19 U.S.C. § 1516a(b)(1)(B)); *see also Corus Staal BV v. Dep't of Commerce*, 395 F.3d 1343, 1346 (Fed. Cir. 2005). "'Substantial evidence' means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Crawfish Processors Alliance v. United States*, 483 F.3d 1358, 1361 (Fed. Cir. 2007) (quoting *Consol. Edison v. NLRB*, 305 U.S. 197, 229 (1938)); *see also Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) ("{s}ubstantial evidence is more than a mere scintilla").

"Even if it is possible to draw two inconsistent conclusions from evidence in the record, such a possibility does not prevent Commerce's determination from being supported by substantial evidence." *Am. Silicon Techs. v. United States*, 261 F.3d 1371, 1376 (Fed. Cir. 2001) (citing *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1044 (Fed. Cir. 1996)). "{T}he Court may not substitute its judgment for that of the {agency} when the choice is between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." *Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1326 (Ct. Int'l Trade 2006) (citations and internal quotations omitted).

In undertaking its analysis, the Court grants "'significant deference to Commerce's interpretation of a scope order,' so long as Commerce's interpretation is not 'contrary to the order's terms,' and does not 'change the scope of the order.'" *Mid Continent Nail Corp. v. United States*, 725 F.3d 1295, 1300 (Fed. Cir. 2013) (quoting *Global Commodity Group LLC v. United States*, 709 F.3d 1134, 1138 (Fed. Cir. 2013)). This is because scope rulings involve "a highly fact intensive and case-specific determination." *See Fedmet Resources Corp. v. United States*, 755 F.3d 912, 918 (Fed. Cir. 2014) (quoting *King Supply Co. LLC v. United States*, 674 F.3d 1343, 1345 (Fed. Cir. 2012)). Thus, scope rulings are "particularly within the expertise of {Commerce}." *Sandvik Steel Co. v. United States*, 164 F.3d 596, 600 (Fed. Cir. 1998); *see also Walgreen Co. of Deerfield v. United States*, 620 F.3d 1350, 1355 (Fed. Cir. 2010).

Commerce also "enjoys substantial freedom to interpret and clarify its antidumping duty orders." *See Duferco Steel, Inc. v. United States*, 296 F.3d 1087, 1094-95 (Fed. Cir. 2002) (quoting *Ericsson GE Mobile Communications, Inc. v. United States*, 60 F.3d 778, 782 (Fed. Cir. 1995)). "However, Commerce cannot 'interpret' an antidumping order so as to change the scope of that order, nor can Commerce interpret an order in a manner contrary to its terms." *See*

*Eckstrom Indus., Inc. v. United States*, 254 F.3d 1068, 1072 (Fed. Cir. 2001) (citing *Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1370 (Fed. Cir. 1998)).

## II.    **Legal Framework For Scope Rulings**

When Commerce publishes an AD or CVD order, it defines the scope of the order by "includ{ing} a description of the subject merchandise, in such detail as {Commerce} deems necessary." 19 U.S.C. § 1673e(a)(2). Commerce is often called upon to determine whether a certain product is included within the scope of an AD or CVD order because it must write scope language in general terms. 19 C.F.R. § 351.225(a); *see also Meridian Prod., LLC v. United States*, 851 F.3d 1375, 1379 (Fed. Cir. 2017). When Commerce confronts such a question, it follows the analytical framework and procedures set forth in 19 C.F.R. § 351.225. *See Shenyang Yuanda Aluminum Indus. Eng'g Co. v. United States*, 776 F.3d 1351, 1354 (Fed. Cir. 2015) ("There is no specific statutory provision governing the interpretation of the scope of antidumping or countervailing orders.").

Commerce first "will consider the language of the scope and may make its determination on this basis alone if the language of the scope . . . is dispositive." 19 C.F.R. § 351.225(k)(1). As part of that inquiry, the regulation sets forth several primary sources that "may be taken into account…at the discretion of the Secretary." 19 C.F.R. § 351.225(k)(1)(i). These primary interpretive sources include descriptions of the merchandise contained in the petition and investigation, previous or concurrent determinations by Commerce, and determinations of the ITC pertaining to the order at issue. *Id.* Commerce may also consider secondary interpretive sources under (k)(1)(ii) such as "any other determinations of {Commerce} or the {ITC} not identified {under (k)(1)(i)}, Customs rulings or determinations, industry usage, dictionaries, and any other relevant record evidence." 19 C.F.R. § 351.225(k)(1)(ii). To the extent such

secondary sources conflict with the primary sources, however, the primary sources "will

normally govern." *Id.*

      If Commerce determines that descriptions of the merchandise contained in the (k)(1)

sources are dispositive, Commerce issues a final scope ruling without review of other sources.

*See* 19 C.F.R. § 351.225(k); *see also Tak Fat Trading Co. v. United States*, 396 F.3d 1378, 1382

(Fed. Cir. 2005).  This Court reviews "Commerce's analysis of the (k)(1) sources against the

product in question" as an issue of fact under the substantial evidence standard.  *United Steel &*

*Fasteners, Inc. v. United States*, 947 F.3d 794, 799 (Fed. Cir. 2020); *see also Meridian Prod*.,

851 F.3d at 1382 (citing *Fedmet Res. Corp. v. United States*, 755 F.3d 912, 919-22 (Fed. Cir.

2014)).

### III.     Commerce's Scope Determination Is Supported By Substantial Evidence And In Accordance With Law

      In accordance with the regulatory framework discussed above, Commerce concluded that

calcium glycinate is not within the scope of the Orders based on consideration of sources listed

in 19 C.F.R. § 351.225(k)(2).  Specifically, Commerce relied on the language of the Orders, the

information in the ITC Report from the investigation, and the description of calcium glycinate

provided by GEO in its application.  Final Scope Ruling at 4-5.  Based on these sources,

Commerce concluded that calcium glycinate is a precursor to glycine slurry, which is in turn a

precursor to dried crystalline glycine, but that calcium glycinate is not itself a precursor to dried

crystalline glycine.  This determination is supported by substantial evidence and in accordance

with law, and should be sustained.

      Commerce began by considering the scope language of the Orders.  The Orders expressly

apply to "glycine of all purity levels, which covers all forms of crude or technical glycine

including, but not limited to, sodium glycinate, glycine slurry and any other forms of amino

acetic acid or glycine." *Id.* at 4 (quoting Orders). They also cover "glycine and precursors of dried crystalline glycine that are processed in a third country." *Id.* However, the scope language in the Orders "does not include inputs or precursors used in the production of glycine" more generally. *Id.* Accordingly, to be within the scope of the Orders, calcium glycinate must either be a form of glycine or a precursor of dried crystalline glycine. It is not enough to simply be a "precursor of glycine," as stated in GEO's scope ruling application. Scope Ruling Application at 6.

Accordingly, Commerce next considered the process for converting calcium glycinate into glycinate to determine whether calcium glycine constitutes a form of glycine or a precursor to dried crystalline glycine. Final Scope Ruling at 4. GEO explained in its Scope Ruling Application:

> Producing glycine from calcium glycinate requires that the calcium glycinate first be dissolved in water. The resulting solution is then treated with sulfuric acid to form glycine, which remains in solution, and the precipitate calcium sulfate. The calcium sulfate is filtered from the solution. The remaining filtrate is then crystallized to recover the glycine as wet cake and dried. Manufacturing equipment necessary to produce glycine from {monochloroacetic acid} and sodium glycinate, *i.e.*, reactor, crystallizer, filters and dryer, are the same manufacturing equipment needed to manufacture glycine from calcium glycinate.

Scope Ruling Application at Exhibit 6. In other words, calcium glycinate is not itself glycine, but rather can be turned into glycine—in the form of glycine slurry—by dissolving it in water and treating it with sulfuric acid, resulting in a solution comprised of glycine and calcium sulfate. *Id.* Then, the calcium sulfate must be filtered from the glycine slurry, and the glycine slurry must be dried to produce dried crystalline glycine. *Id.*

In view of this process, Commerce concluded that calcium glycinate is not itself glycine, nor is it a precursor of dried crystalline glycine because it "has to be processed into glycine

slurry first through multiple production steps and chemical processes, before glycine slurry is turned into dried crystalline glycine." *Id.* at 5. In short, calcium glycinate is a precursor to glycine slurry, which is in turn a precursor to dried crystalline glycine, but calcium glycinate is not itself a precursor to dried crystalline glycine. *Id.* at 4-5; ITC Report at IV-1, n.4 (identifying glycine slurry as "glycine in a non-crystallized form" and a "precursor{} of dried crystalline glycine").

IV.    **Commerce's Interpretation Of The Term "Precursor" Is Reasonable**

Deer Park argues that Commerce's determination is not supported by substantial evidence "because it unreasonably limits the meaning of the term 'precursor' to glycine slurry." Pl. Br. at 7. Deer Park offers three definitions of precursor which it argues show that calcium glycinate is a precursor of glycine. *Id.* However, these arguments are waived because they were not presented to Commerce during the scope proceeding; in any event, Commerce's interpretation of the term "precursor" was reasonable.

First, these definitions were not presented to Commerce and are therefore not a part of the record before this Court. In 2021, Commerce amended 19 C.F.R. § 351.225 to clarify the responsibilities of scope ruling applicants. *See Regulations To Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws,* 85 Fed. Reg. 49,472, 49,477-78 (Dep't of Commerce Aug. 13, 2020). In particular, "{t}o the extent reasonably available to the applicant, the scope ruling application must include..."{f}actual information supporting the applicant's position, including . . . relevant excerpts of other documents identified in paragraph (k)(1) of this section." 19 C.F.R. § 351.225(c)(2)(viii)-(ix). Paragraph (k)(1) explicitly includes dictionaries. *See* 19 C.F.R. § 351.225(k)(1)(ii). Thus, a scope applicant is directed to provide dictionary definitions that it deems relevant in its application to the extent reasonably available. *See* 19 C.F.R. §§ 351.225(c)(2)(viii)-(ix), (k)(1)(ii). Deer Park has not contend that these

10

dictionary definitions were not reasonably available to the applicant.  Further, Question 8 of the Scope Application explicitly instructs applicants to attach factual information "including… dictionaries" that support their positions.  Scope Application at 6.  Nonetheless, GEO did not provide any dictionary excerpts or any other proposed definition of "precursor."  Deer Park effectively seeks to supplement GEO's application with information it failed to include in the first instance, despite clear instructions to do so.  These definitions are not part of the record before Commerce, and this Court should not consider them when determining whether Commerce's decision was supported by substantial evidence.  *See Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1379 (Fed. Cir. 2009) (explaining that "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court" (internal citation omitted)).

Additionally, by failing to raise these definitions of "precursor" during the administrative proceeding, plaintiff failed to exhaust its administrative remedies with respect to that issue.  This Court "shall, where appropriate, require the exhaustion of administrative remedies."  28 U.S.C. § 2637(d).  This statute "indicates a congressional intent that, absent a strong contrary reason, the court should insist that parties exhaust their remedies before the pertinent administrative agencies."  *Boomerang Tube LLC v. United States*, 856 F.3d 908, 912 (Fed. Cir. 2017) (citing *Corus Staal BV*, 502 F.3d at 1379 (Fed. Cir. 2007)).  This Court "generally takes a 'strict view'" of this requirement.  *Corus Staal BV*, 502 F.3d at 1379; *see also Ta Chen Stainless Steel Pipe v. United States*, 342 F. Supp. 2d 1191, 1205 (Ct. Int'l Trade 2004).  "The exhaustion doctrine requires a party to present its claims to the relevant administrative agency for the agency's consideration before raising these claims to the Court."  *See Shandong Huarong Mach. Co.*, 435 F. Supp. 2d 1261, 1292 (Ct. Int'l Trade 2006) (internal quotation and citation omitted).

However, during the administrative proceeding, GEO never argued that Commerce should adopt or consider any particular definitions of "precursor" in its scope inquiry.

There are limited exceptions to the exhaustion requirement, involving situations where: (1) the plaintiff raised a pure question of law that did not require further agency involvement, (2) the plaintiff did not have timely access to the confidential record, (3) an intervening judicial interpretation since the administrative proceeding would have changed the agency result, and (4) raising the argument at the administrative level would have been futile. *See, e.g., Gerber Food (Yunnan) Co. v. United States*, 601 F. Supp. 2d 1370, 1377 (Ct. Int'l Trade 2009). However, none of these exceptions apply here. Accordingly, the Court should not consider Deer Park's argument concerning the appropriate definition of a "precursor."

Even if the Court considers the definitions provided by Deer Park, these expansive definitions, such as "'any chemical reactant which takes part at any stage in the production by whatever method of a toxic chemical,'" could be applied to virtually any chemical that could, after being subject to multiple chemical reactions and production processes, eventually yield glycine. Pl. Br. at 8. Although Commerce has not had an opportunity to expressly consider and respond to these broad definitions, Commerce supported its scope determination by explaining that where a substance had to go through "multiple production steps and chemical processes" in order to form glycine slurry, a substance that the ITC considered to be a precursor to dried crystalline glycine, calcium glycine is not itself a precursor of dried crystalline glycine. *Id.* at 5. Commerce, based on the information in the record before it, reasonably limited its definition of "precursor" in this manner to substances that are not too far removed from the final product. Otherwise, the carefully worded phrase "precursors of *dried crystalline* glycine" would be expanded so far as to render the limiting words superfluous, and to instead include precursors of

*any* kind of glycine. This would contradict the plain scope language stating that the Orders cover "glycine at any purity level or grade." Final Scope Order at 2.

Further, Deer Park misconstrues Commerce's determination to mean that glycine slurry is the only product which could be considered a "precursor" of glycine. Pl. Br. at 7. This is incorrect. Rather, Commerce determined, based on the scope language, the description of calcium glycinate GEO provided in its application, and the information in the ITC Report, that calcium glycinate does not constitute a precursor for purposes of the scope because it must undergo "multiple production processes in which it is treated with a chemical, resulting in a solution of glycine and another chemical, and then separated from this other chemical to become glycine slurry," itself a precursor of glycine. Final Scope Ruling at 5. In other words, multiple productions were required just to yield a precursor to calcium glycinate, and Commerce reasonably found that calcium glycinate is therefore a "non-scope input" rather than a precursor of dried crystalline glycine itself. *Id*. at 4. As discussed in Section V, *infra*, Commerce's determination does not limit the meaning of precursor exclusively to glycine slurry; rather, Commerce's determination leaves open the possibility for other products which require fewer production steps to yield dried crystalline glycine to be considered precursors.

Deer Park next argues that Commerce failed to address the similarity between the production processes of sodium glycinate and calcium glycinate. Pl. Br. at 9. Deer Park reasons that Commerce "may not disregard record evidence that detracts from its intended conclusion," and cites portions of the ITC Report suggesting that sodium glycinate is a precursor to dried crystalline glycine and is processed in a similar manner to calcium glycinate. Pl. Br. at 9-10. According to Deer Park, this is similar to the issue in *Star Pipe Products*, 365 F. Supp. 3d 1277 (Ct. Int'l Trade 2019), where Commerce "relied on certain language in the USITC report to

13

determine that flanges are within the scope of the order but 'did not quote or discuss the sentence in the ITC Report immediately preceding the one on which it relied,' suggesting that the product is outside the scope of the order." Pl. Br. at 10 (citing *Star Pipe Prods. v. United States*, 365 F. Supp. 3d at 1282).

However, Deer Park's argument is once again barred by the exhaustion requirement. If GEO believed the ITC Report and its discussion of sodium glycinate's production process supported its position, it was required by Commerce's regulations and the scope application questions to provide such information. *See* 19 C.F.R. § 351.225(c)(2)(vii)-(ix). But GEO never argued before Commerce or provided evidence illustrating that calcium glycinate is within the scope of the Orders due to its similarity to sodium glycinate. Instead, GEO's reference to sodium glycinate in the Scope Application is limited to a statement in the Declaration of Robert Steven "Steve" Outlaw that "{m}anufacturing equipment necessary to produce glycine from MCAA {(monochloroacetic acid)} and sodium glycinate, *i.e.*, reactor, crystallizer, filters and dryer, are the same manufacturing equipment needed to manufacture glycine from calcium glycinate." Scope Application at Exhibit 6. This lone statement was not sufficient to put Commerce on notice of Deer Park's current, more-developed argument regarding similarities between sodium glycinate and calcium glycinate. *See, e.g.*, *Stanley Works (Langfang) Fastening Systems Co. v. United States*, 279 F. Supp. 3d 1172, 1189 (Ct. Int'l Trade 2017) (finding "{b}road, generalized challenges" to Commerce's differential pricing analysis insufficient to "incorporate any conceivable challenge to elements of that analysis"). Thus, Commerce had no reason or opportunity to consider the production process of sodium glycinate as compared with calcium glycinate. Deer Park has therefore failed to exhaust its administrative remedies with respect to this argument, and it should not be considered.

14

While it is true that Commerce cited a footnote in the ITC Report that mentioned sodium glycinate, Commerce did not ignore record evidence that undermined its conclusion, as in *Star Pipe Products*. Rather, in the Final Scope Ruling, Commerce cited the ITC Report simply to support its uncontroversial statement that "{g}lycine slurry is glycine in non-crystalline form and is a '{precursor} of dried crystalline glycine.'" Final Scope Ruling at 4. Deer Park does not dispute this statement or argue that any of the surrounding language in the ITC Report undermines it. Instead, Deer Park attempts to use Commerce's citation to the ITC Report to raise a separate and entirely new argument about the similarity between calcium glycinate and sodium glycinate. Pl. Br. at 9-10. To do so, Deer Park cites a different portion of the ITC Report which describes the production process of sodium glycinate, and argues that Commerce should have concluded that sodium glycinate undergoes the same production process as calcium glycinate to yield dried crystalline glycine. *Id*. However, the fact that Commerce cited a footnote in the ITC Report that mentioned sodium glycinate did not mean that Commerce was required to scrutinize the entirety of the report to determine whether sodium glycinate bore any similarities to calcium glycinate. Commerce had no reason to conduct such an analysis, because GEO never asserted during the scope proceeding that calcium glycinate was in scope because of its similarity to sodium glycinate. Deer Park therefore cannot overcome its failure to raise this argument during the administrative proceeding.

**V.    Commerce Did Not Unreasonably Limit "Precursors" To Only Glycine Slurry**

Deer Park argues that Commerce's determination "unlawfully changes the scope of the Orders because it limits the term 'precursor of dried crystalline glycine' to a single product — glycine slurry." Pl. Br. at 11. This argument is premised on two assumptions that Deer Park fails to support with record evidence:  (1) that Commerce's interpretation does not allow for a

product which yields glycine slurry prior to dried crystalline glycine to be considered in-scope; and (2) that production of glycine slurry is necessary to produce dried crystalline glycine.

First, as discussed in Section III, *supra*, Commerce did not conclude that no precursor of glycine slurry could ever be a precursor of dried crystalline glycine. Rather, Commerce determined, after examining record evidence of the steps necessary to convert calcium glycinate into dried crystalline glycine, which requires multiple steps to convert calcium glycinate into glycine slurry and later dried crystalline glycine, that calcium glycinate is not a precursor to dried crystalline glycine. Final Scope Ruling at 4-5. Commerce did not foreclose the possibility that a different precursor of glycine slurry, such as a chemical that is more readily converted into dried crystalline glycine, could be within the scope of the Orders.

Second, Deer Park asserts that glycine can only be produced from a precursor of glycine slurry. To support this claim, Deer Park cites the ITC Report and states that "{g}lycine is primarily produced using two separate methods: the hydrogen cyanide ('HCN') method and the monochloroacetic acid ('MCAA') method." Pl. Br. at 11. Then, Deer Park cites a document that is not on the record of this proceeding for the proposition that in both processes, glycine slurry is always produced prior to dried crystalline glycine. Pl. Br. at 11 (citing *Glycine From India, Japan, and Korea* Investigation Nos. 731–TA–1111-1113 (Preliminary), USITC Pub. 3921 (May 2007)). Because this information was not on the record before Commerce, this Court should not consider it. *See Axiom Res. Mgmt., Inc.*, 564 F.3d at 1379 (explaining that "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court" (citation omitted)). In any event, Deer Park states that glycine is "*primarily* produced" using those two methods, implying there may be other production methods which do not require the production of glycine slurry prior to dried

crystalline glycine.  Pl. Br. at 11 (emphasis added).  Finally, although Deer Park further asserts that "{n}o other product arising from the known glycine production methods can satisfy Commerce's erroneous interpretation of the term 'precursor,'" this claim lacks any citation or other support and should be disregarded.  Pl. Br. at 12.

## VI.    <u>The Scope Determination Complies with Commerce's Regulations</u>

As demonstrated above, Commerce applied the regulatory framework by considering the Orders' scope language and certain (k)(1) sources to find calcium glycinate not covered by the scope of the Orders.  Final Scope Ruling at 4-5.  Deer Park argues that Commerce did not comply with its regulations by failing to consider other primary interpretive sources.  However, 19 C.F.R. § 351.225(k)(1) expressly leaves the decision of which (k)(1) sources to review, if any, entirely within Commerce's discretion, and Deer Park's argument is therefore unpersuasive.

The regulation provides that "{i}n determining whether a product is covered by the scope of the order at issue, the Secretary will consider the language of the scope and may make its determination on this basis alone if the language of the scope… is dispositive."  19 C.F.R. § 351.225(k)(1).  The regulation then sets out the "primary interpretive sources," which "*may be taken into account* under paragraph (k)(1) introductory text of this section, *at the discretion of the Secretary*."  *Id*. (emphasis added).  These include "{d}eterminations of the Commission pertaining to the order at issue, including reports issued pursuant to the Commission's initial investigation."  19 C.F.R. § 351.225(k)(1)(i)(D).

Consistent with this regulatory framework, Commerce relied upon the Orders' scope language and the ITC Report to determine that calcium glycinate, as described by GEO in its scope ruling application, is a non-scope input of glycine and not covered by the scope of the Orders.  Final Scope Ruling at 4-5.  Deer Park's contention that Commerce is required to consider other primary interpretive sources runs counter to the regulation, which leaves the

question of whether to consider any of the primary interpretive sources to Commerce's discretion, based on the facts and issues specific to the scope ruling request. Pl. Br. at 14.

Deer Park cites *Star Pipe Products* to argue that Commerce *must* consider certain documents, but *Star Pipe Products* relied upon a former version of the regulation and is therefore of no persuasive value. Pl. Br. at 10 (citing *Star Pipe Prods.*, 365 F. Supp. 3d at 1283). In *Star Pipe Products*, the Court found that Commerce failed to comply with a previous version of 19 C.F.R. § 351.225. The former version of the regulation provided that Commerce "*will* take into account" certain sources including "the descriptions of the merchandise contained in the petition." The Court explained that (k)(1) therefore "*require{d}* that the Secretary of Commerce 'take into account . . . {t}he descriptions of the merchandise contained in the petition.'" *Star Pipe Prods*, 365 F. Supp. 3d at 1282 (citing 19 C.F.R. § 351.225(k)(1) (1997) (emphasis added)). *Id*. at 1279 (citing 19 C.F.R. § 351.225 (k)(1) (emphasis added)). The current regulations, effective at the time of this scope inquiry, uses different language, providing that Commerce *may* consider those items, at its discretion. 19 C.F.R. § 351.225(k)(1).

In addition, *Star Pipe Products* only emphasizes the fact that, however Deer Park frames its arguments, it cannot get around its failure to raise these arguments in its scope application. In *Star Pipe Products*, the Court noted that the scope ruling applicant had made specific arguments "grounded in" the petition, and concluded that "Commerce did not comply with its regulation when it failed to consider the merchandise descriptions in the petition *in response to petition-elated arguments* Star Pipe made in the Scope Ruling Request." *Star Pipe Prods.*, 365 F. Supp. 3d at 1282 (emphasis added). Here, by contrast, Deer Park argues that Commerce failed to consider sources that support an argument Deer Park raised for the first time to this Court, namely, calcium glycinate's alleged similarity to sodium glycinate. As explained above, the

scope application questions and Commerce's regulations required GEO to provide all supporting evidence and a narrative explanation as to why calcium glycinate was within the scope of the Orders. Yet GEO never argued that calcium glycinate's similarity to sodium glycinate supported its position, nor did it present the documents that it now faults Commerce for not considering. 19 C.F.R. § 351.225(c)(2)(viii)-(ix). Accordingly, as discussed above, these arguments are precluded by Deer Park's failure to exhaust administrative remedies.

In addition, Deer Park has no basis for citing to the extra-record evidence that GEO failed to include in its application to support its argument that Commerce's interpretation is "incomplete" without the consideration of these documents. Specifically, Deer Park relies on information from the petition, a supplemental questionnaire issued by Commerce following the filing of the petition, petitioners' response to that questionnaire, and Commerce's *Final Partial Affirmative Determination of Circumvention pertaining to the Antidumping Duty Order on Glycine from China,* 77 Fed. Reg. 73,426 (Dep't of Commerce Dec. 10, 2012) (related to the AD order on glycine from China which differs from scope of the Orders relevant here) to support its argument that calcium glycinate is within the scope of the Orders. Pl. Br. at 14-17. GEO did not include any of these items in its scope ruling application, and Commerce did not consider them, so they are not part of the administrative record and should not be considered now. *See Axiom Res. Mgmt.*, 564 F.3d at 1379 (explaining that "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court" (citation omitted)).

Finally, even if the Court considered the merits of Deer Park's argument, it is unpersuasive. Deer Park cites various sources suggesting that sodium glycinate, as well as "non-reacted ammonia-monochloroacetic acid mix," should be within the scope of the Orders. For

instance, Deer Park quotes a portion of a sentence in the *Final Partial Affirmative Determination of Circumvention pertaining to the Antidumping Duty Order on Glycine from China* which states "{t}he Department preliminarily determined that the processing of Chinese-origin technical grade or crude glycine, including but not limited to AAA–97TE, ACAA- 97TE, sodium glycinate and glycine slurry, is not substantially transformed into glycine of Indian origin and therefore such glycine remains within the scope of the Order." Pl. Br. at 14-15 (citing 77 Fed. Reg. 73426 (Dep't of Commerce Dec. 10, 2012)). Deer Park also cites language from the petition suggesting that glycine slurry and certain "glycine intermediates" such as "sodium glycinate and non-reacted ammonia-monochloroacetic acid mix" can "readily be turned into dried crystalline glycine." Pl. Br. at 15-16. Citing the supplemental questionnaire responses, Deer Park goes on to explain why the scope of the investigation included "crude glycine, including sodium glycinate, and other precursors of dried crystalline glycine." *Id.* at 16.

None of these sources provide insight into the key question, which is whether calcium glycinate is either a form of glycine or a precursor of dried crystalline glycine. At most, they suggest other substances are within the scope, without explaining whether or how those substances relate to calcium glycinate. Further, Deer Park's reliance on the AD order on glycine from China is misplaced because that order has an entirely different scope than that of the orders at issue.

## CONCLUSION

For these reasons, we respectfully request that the Court deny plaintiff's motion and sustain Commerce's final scope ruling.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/Claudia Burke by Tara K. Hogan
CLAUDIA BURKE
Deputy Director

OF COUNSEL:                              /s/Kelly Geddes
JOSEPH GROSSMAN-TRAWICK                   KELLY GEDDES
Attorney                                  U.S. Department of Justice
Office of the Chief Counsel               Commercial Litigation Branch
    for Trade Enforcement & Compliance    P.O. Box 480, Ben Franklin Station
U.S. Department of Commerce               Washington, DC 20044
Washington, D.C.                          Tel:  (202) 307-2867
Tel:  (202) 365-7536                      Email:  Kelly.Geddes2@usdoj.gov
Email:  Joseph.Grossman-Trawick@trade.gov

August 9, 2024                            *Attorneys for Defendant*

21

<u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify, pursuant to section 2(B)(1) of the Standard Chambers Procedures of this Court, that this brief contains 6,152 words, excluding the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature, as calculated by the word processing system used to prepare this brief (Microsoft Word).

<u>/s Kelly M. Geddes</u><br>
Kelly M. Geddes