Slip Op. 25-38

## UNITED STATES COURT OF INTERNATIONAL TRADE

DEER PARK GLYCINE, LLC,

      Plaintiff,

v.

UNITED STATES,

      Defendant.

Before: Joseph A. Laroski, Jr., Judge

Court No. 23-00238

## OPINION AND ORDER

[Remanding the U.S. Department of Commerce's determination interpreting the scope of antidumping duty orders on glycine from India, Japan, and Thailand, and countervailing duty orders on glycine from India and China.]

Dated: April 10, 2025

Meixuan (Michelle) Li and Kerem Bilge, Thompson Hine LLP, of Washington, DC, argued for plaintiff Deer Park Glycine, LLC. With Mr. Bilge on the brief was David M. Schwartz, Thompson Hine LLP, of Washington, DC.

Claudia Burke, Deputy Director, Commercial Litigation Branch, U.S. Department of Justice, of Washington, DC, argued for defendant United States. With her on the brief were Brian M. Boynton, Principal Deputy Assistant Attorney General, and Patricia M. McCarthy, Director. Of counsel were Brien Charles Stonebreaker and Joseph Grossman-Trawick, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

Laroski, Judge: This action is a challenge to the final scope ruling of the U.S.

Department of Commerce ("Commerce") regarding calcium glycinate (the

"merchandise") imported from the People's Republic of China ("China"), India,

Japan, and Thailand. Commerce's final scope ruling found that the merchandise is

not covered by the antidumping and countervailing duty orders on glycine from
India, Japan, Thailand, and China.  Final Scope Ruling on Calcium Glycinate, P.R.
9 at 1 (Oct. 11, 2023) ("Scope Ruling"); see also Amended Final Affirmative
Antidumping Duty Determination and Antidumping Duty Orders; Glycine from
India and Japan, 84 Fed. Reg. 29,170 (June 21, 2019); Countervailing Duty Orders;
Glycine from India and the People's Republic of China, 84 Fed. Reg. 29,173 (June
21, 2019); Antidumping Duty Order; Glycine from Thailand, 84 Fed. Reg. 55,912
(Oct. 18, 2019) (collectively, the "Orders").  Commerce concluded that the
merchandise falls outside the scope of the Orders based on its consideration of
interpretive sources specified by 19 C.F.R. § 351.225(k)(1), including the plain
language of the Orders and a related report issued by the International Trade
Commission ("the Commission").  See Scope Ruling at 4–6.  Deer Park Glycine, LLC
("Deer Park") brought this action against the United States (the "Government") to
challenge the Scope Ruling.  Based on Commerce's alleged failure to reach a
decision regarding the merchandise that is supported by substantial evidence and
otherwise in accordance with law, Deer Park moves for judgment on the agency
record and asks the court to remand proceedings to Commerce.  The Government
opposes Deer Park's motion and asks the court to sustain Commerce's final scope
ruling.  For the reasons detailed below, the court agrees with Deer Park and,
accordingly, remands proceedings to Commerce for reconsideration of the analysis it
performed and the conclusions it reached in issuing the Scope Ruling.

# BACKGROUND

## I.     The Orders

On June 21, 2019, and October 18, 2019, Commerce published Orders on glycine from China, India, Japan, and Thailand.  See Orders.  For purposes of Commerce's scope inquiry, the Scope Ruling, and this dispute, the Orders are identical.  See id.  The merchandise subject to the Orders includes "glycine of all purity levels, which covers all forms of crude or technical glycine including, but not limited to, sodium glycinate, glycine slurry and any other forms of amino acetic acid or glycine."  Orders; see Scope Ruling at 2, 4.  The scope of the Orders also includes a clarification concerning merchandise processed in a third country:

> Subject merchandise also includes glycine and precursors of dried crystalline glycine that are processed in a third country, including, but not limited to, refining or any other processing that would not otherwise remove the merchandise from the scope of these *Orders* if performed in the country of manufacture of the in-scope glycine or precursors of dried crystalline glycine.

Orders; see Scope Ruling at 2.  As written, then, the Orders contemplate merchandise that falls within the categories of "all forms of crude or technical glycine," and "glycine and precursors of dried crystalline glycine that are processed in a third country," including products within both such categories.  See Orders.

## II.     Scope Inquiry Proceedings

On August 14, 2023, Deer Park (then doing business as GEO Specialty Chemicals, Inc.) filed a scope ruling application requesting that Commerce find

merchandise known as calcium glycinate subject to the Orders.  Scope Inquiry
Application; Calcium Glycinate, P.R. 1 (Aug. 14, 2023) ("Application"); see Scope
Ruling at 1–2.  In the Application, Deer Park described the merchandise as a
"precursor used in the manufacture of glycine" that is "used as a dietary supplement
for humans and animals, as a pharmaceutical intermediate, and in cosmetic
applications."  Application at 3.  Deer Park also specified that the molecular formula
of the merchandise is $C_4H_8CaN_2O_4$.  Id. at 4.  Elaborating upon the chemical
characteristics of the merchandise, Deer Park wrote: "Calcium glycinate is the
result of the chelation of calcium and glycine.  Chelation is a type of bonding of ions
and molecules to metal ions."  Id.  "As a precursor in the production of glycine,
calcium glycinate is deconstructed to form glycine."  Id.  Later in the Application,
Deer Park stated that the merchandise is subject to the Orders because glycine "can
be retrieved from calcium glycinate when the product is deconstructed," and "when
used in the production of glycine, calcium glycinate is a precursor of glycine."  Id. at
6.  Thus, although Deer Park cited to the plain language of the Orders in describing
the merchandise, it did not locate calcium glycinate within a specific textual portion
of the written description of the Orders.  See id. at 3–6.

On August 30, 2023, Commerce acknowledged and accepted the Application,
initiated a scope inquiry concerning whether the merchandise is subject to the
Orders, and invited interested parties (other than Deer Park) to submit comments
to rebut, clarify, or correct information contained in the Application.  Initiation of

<u>Scope Inquiry; Calcium Glycinate</u>, P.R. 8 (Aug. 30, 2023) ("<u>Scope Initiation</u>"); <u>Scope Ruling</u> at 2.  Commerce received no such input from interested parties.  <u>See</u> <u>Scope Ruling at 2.</u>  On October 11, 2023, Commerce issued its ruling.  <u>Id.</u>

Commerce began its discussion in the Scope Ruling by referring to the written description of the scope of the Orders and providing the following summary:

> The merchandise covered by these Orders is glycine at any purity level or grade. This includes glycine of all purity levels, which covers all forms of crude or technical glycine including, but not limited to, sodium glycinate, glycine slurry and any other forms of amino acetic acid or glycine. Subject merchandise also includes glycine and precursors of dried crystalline glycine that are processed in a third country, including, but not limited to, refining or any other processing that would not otherwise remove the merchandise from the scope of these Orders if performed in the country of manufacture of the in-scope glycine or precursors of dried crystalline glycine.

<u>Id.</u> at 2.  Commerce also observed that, according to Deer Park, the merchandise "is a precursor of glycine because glycine can be retrieved from the deconstruction of calcium glycinate." <u>Id.</u> (citing <u>Application</u> at 6).  Commerce then explained its understanding of Deer Park's position – namely, that calcium glycinate is subject to the Orders because it is a precursor of glycine. <u>Id.</u> at 3.

With that context, Commerce began its scope analysis in earnest.  First, referring again to the written description, Commerce concluded that the scope "does not include inputs or precursors used in the production of glycine." <u>Id.</u> at 4.  This appears to be an interpretive conclusion based on the absence of the phrase "inputs or precursors used in the production of glycine" in the written description of Orders,

rather than one intended to suggest that "inputs or precursors used in the

production of glycine" cannot otherwise fall within the expressly included categories

of "glycine of all purity levels," "all forms of crude or technical glycine," and/or

"precursors of dried crystalline glycine that are processed in a third country." Id.

Armed with these initial textual observations, Commerce turned to consider the

process by which the merchandise is used in the production of glycine.

First, Commerce quoted Exhibit 6 of the Scope Application, the declaration of

chemical engineer Steve Outlaw, which stated in part:

> Producing glycine from calcium glycinate requires that the calcium
> glycinate first be dissolved in water. The resulting solution is then
> treated with sulfuric acid to form glycine, which remains in solution, and
> the precipitate calcium sulfate. The calcium sulfate is filtered from the
> solution. The remaining filtrate is then crystallized to recover the
> glycine as wet cake and dried. Manufacturing equipment necessary to
> produce glycine from [monochloroacetic acid] and sodium glycinate . . .
> are the same manufacturing equipment needed to manufacture glycine
> from calcium glycinate.

Scope Ruling at 4 (quoting Scope Ruling Application, Ex. 6 (Aug. 11, 2023) ("Outlaw

Declaration")). In his declaration, Mr. Outlaw also indicated that he possessed

knowledge and expertise in the manufacture of glycine "from various precursor

chemicals, including . . . sodium glycinate and calcium glycinate." Outlaw

Declaration. As Commerce summarized the above process: "production of glycine

from calcium glycinate begins with turning calcium glycinate into wet glycine slurry

and subsequently drying it into a crystallized form." Scope Ruling at 4. Commerce

further observed that Deer Park had described "calcium glycinate as a precursor of

glycine but not as glycine itself." <u>Id.</u>  Despite consulting the Outlaw Declaration in part of its analysis, however, Commerce did not address Mr. Outlaw's statement regarding the similarity in the production equipment needed and process used to make glycine from calcium glycinate and sodium glycinate.  <u>See id.</u>

Upon consideration of the above information, Commerce concluded that the merchandise is a "non-scope input used in the production of glycine slurry and glycine slurry is a precursor of dried crystalline glycine." <u>Id.</u>  As Commerce asserted, the merchandise is a "non-scope input or precursor of glycine and, thus, outside the scope" because it "requires multiple production processes in which it is treated with a chemical, resulting in a solution of glycine and another chemical, and then separated from this other chemical to become glycine slurry." <u>Id.</u> at 5 (citing <u>Outlaw Declaration</u>).  Further explaining its understanding of how the merchandise is used to produce glycine, Commerce reasoned: "Because calcium glycinate has to be processed into glycine slurry first through multiple production steps and chemical processes, before glycine slurry is turned into dried crystalline glycine, we find that calcium glycinate is not a precursor of dried crystalline glycine." <u>Id.</u> Under this view, Commerce posited, to find a precursor of an in-scope precursor also within the scope would improperly expand the scope of the Orders.  <u>Id.</u>

In focusing on whether, like glycine slurry, the merchandise is a precursor of dried crystalline glycine, Commerce appeared to emphasize the second part of the written description of the Orders – i.e., the sentence concerning any such precursors

"that are processed in a third country." Id. at 4–5. Thus, in finding that the

merchandise is not within the scope of the Orders, Commerce did not discuss

specifically whether calcium glycinate might be characterized as "glycine at any

purity level or grade," a form of "crude or technical glycine," or "sodium glycinate,

glycine slurry, and any other forms of amino acetic acid or glycine." See id. at 2–5.

On November 10, 2023, Deer Park filed this action challenging the Scope

Ruling. On June 6, 2024, Deer Park moved for judgment on the agency record,

asking the court to declare the Scope Ruling unsupported by substantial evidence

and remand the Scope Ruling for further consideration by Commerce with

instructions to supplement the record with additional interpretive sources. Pl. Deer

Park Br. in Supp. of Mot. for J. Agency R. ("Deer Park Br.") at 17–18.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2020) and 19

U.S.C. § 1516a(a)(2)(B)(vi) (2020). Section 1581(c) provides for exclusive jurisdiction

over any civil action commenced under section 1516a. 28 U.S.C. § 1581(c). Section

1516a(a)(2)(B)(vi), provides for judicial review of a determination of "whether a

particular type of merchandise is within the class or kind of merchandise described

in an . . . antidumping or countervailing duty order." 19 U.S.C. § 1516a(a)(2)(B)(vi).

In conducting its review, the court must set aside any determination, finding, or

conclusion found "to be unsupported by substantial evidence on the record, or

otherwise not in accordance with law." Id. § 1516a(b)(1)(B)(i).

## DISCUSSION

### I.    The Parties' Contentions

#### A.    Deer Park's Motion Brief

In support of its motion, Deer Park argues that in issuing the Scope Ruling, Commerce failed to reach a conclusion supported by substantial evidence and follow its own regulations.  Deer Park Br. at 4.  Deer Park contends that Commerce's analysis in the Scope Ruling was deficient because it unreasonably narrowed its interpretive inquiry to the meaning of the term "precursor," performed a selective analysis of the Commission's report on glycine, and, in doing so, failed to follow its own regulations.  Id.  Deer Park's argument proceeds in several analytical steps:

First, Deer Park argues that Commerce's plain language analysis, and in particular its approach to the term "precursor" and its selective use of primary interpretive sources is unreasonable and unsupported by substantial evidence. Deer Park Br. at 6–8.  Deer Park initially notes Commerce's focus on the term precursor, which is left undefined in both the written description of the Orders and Commerce's analysis thereof.  Id.  Deer Park contends this supports the view that the plain language of the Orders is non-dispositive as to whether the merchandise is within the scope and as to the definition of precursor more generally.  Id.

Second, Deer Park highlights Commerce's selective reliance upon the Commission's final report from the original investigations concerning glycine from China, India, and Japan.  Id. at 6–7 (citing Glycine from China, India, and Japan;

Final Investigation Report, U.S. Int'l Tr. Comm. Pub. 4,900 (June 2019)

("Commission Report") at I-16, IV-1, n.4).  As Deer Park explains, Commerce relied

upon a footnote in the Commission Report to determine what qualifies as a

precursor to dried crystalline glycine.  Id.; see Scope Ruling at 4 (citing Commission

Report at IV-1, n.4).  The relevant note explains that the original glycine

investigations concerned, in part, "precursors of dried crystalline glycine, including,

but not limited to" glycine slurry and sodium glycinate.  Commission Report at IV-1,

n.4.  From this, as Deer Park notes, Commerce found that "calcium glycinate is a

precursor of glycine slurry, which is an in-scope glycine product, and glycine slurry

is a precursor of dried crystalline glycine."  Deer Park Br. at 7 (quoting Scope

Ruling at 5).  In other words, Commerce inferred that one chemical substance

cannot be considered a precursor of another if it is more than one production step

removed.  Deer Park contends it was unreasonable to draw this inference.

Third, Deer Parks attacks directly Commerce's understanding of the term

"precursor" and its limited construction thereof.  Deer Park cites generally

applicable definitions of precursor from the American Heritage and Merriam-

Webster dictionaries, both of which refer to "a substance . . . from which [another

substance] . . . is formed."  Id. at 8.  Because Commerce did not consult these or any

dictionary definitions in its analysis and calcium glycinate is deconstructed to form

glycine, Deer Park contends that Commerce failed to properly analyze whether

calcium glycinate is an in-scope precursor.  Id. at 7–9.

Fourth, Deer Park underscores how Commerce relied upon the Commission Report in concluding that glycine slurry is an in-scope precursor but ignored the Commission Report's discussion of sodium glycinate and its potential relevance to whether calcium glycinate might also be an in-scope precursor. Id. at 8–9.  As Deer Park explains, the same note from which Commerce derived its insights on glycine slurry identified sodium glycinate as another among the non-exhaustive list of examples of precursors of dried crystalline glycine. Id. at 9.  Yet in its consideration of this note, Commerce appears to have disregarded the striking similarities between the Commission Report's description of how sodium glycinate is used in the production of glycine and the Application's description of how calcium glycinate is used in the production of glycine. Id. Compare Commission Report at I-16 ("Glycine is produced when an acid, such as sulfuric acid, is mixed with sodium glycinate.  The glycine solution then goes through one or more crystallization and filtration steps to produce a pure white glycine powder."), with Outlaw Declaration (describing the treatment of calcium glycinate with sulfuric acid and how the process requires the same manufacturing equipment as with sodium glycinate).  "In short, dried crystalline glycine can be obtained from both sodium glycinate and calcium glycinate using the same production process."  Deer Park Br. at 9.

In essence, Deer Park argues that Commerce acted unreasonably in failing to consider the plain language of the Orders, define the term "precursor," and consider information in the Compare Report that contradicted its conclusion.  Deer Park

reasons that had Commerce acted reasonably with respect to any of these analytical steps, such as by seeking to interpret more of the written description than the term precursor, ascertaining a workable definition of that term, or scrutinizing whether the calcium glycinate is analogous to sodium glycinate, Commerce may have performed a procedurally sufficient analysis and reached a different conclusion.  For these reasons, Deer Park asks the court to remand proceedings.

> B.    The Government's Response Brief

Asking the court to sustain Commerce's determination, the Government argues the Scope Ruling was supported by substantial evidence and otherwise lawful.  The Government frames the interpretive issue that Commerce faced as "whether calcium glycine constitutes a form of glycine or a precursor to dried crystalline glycine," contending Commerce reasonably concluded that "calcium glycinate is not itself glycine, nor is it a precursor of dried crystalline glycine."  Def. United States Br. in Supp. of Resp. to Deer Park Mot. for J. on Agency R., ECF No. 25 (Aug. 9, 2024) ("Gov. Br.") at 9.  The Government defends Commerce as follows:

The first argument the Government offers is that Commerce's interpretive approach to the term "precursor" is reasonable.  In making this point, the Government initially contends that Deer Park waived any arguments related to the definition of "precursor," and specifically those invoking dictionary definitions, because it failed to include these arguments and documents in the Application.  Id. at 10–12.  The Government characterizes the definitions offered in Deer Park's brief

as "expansive," and suggests that Commerce did not have "an opportunity to expressly consider and respond to these broad definitions" during its analysis.  Id. at 12.  The Government summarizes: "Commerce, based on the information in the record before it, reasonably limited its definition of precursor in this manner to substances that are not too far removed from the final product."  Id.  "Otherwise, the carefully worded phrase "precursors of *dried crystalline* glycine" would be expanded so far as to render the limited words superfluous, and to instead include precursors of *any* kind of glycine."  Id.  Thus, according to the Government, Commerce should not have been required to review dictionary definitions not provided in the Application nor to interpret the term precursor broadly.

The Government elaborates by emphasizing that Commerce made its interpretive determination based on the scope language, the description of the merchandise in the Application, and the information in the Commission Report.  Id. at 13.  From this, Commerce found it significant that it takes "multiple production processes" to deconstruct calcium glycinate into dried crystalline glycine.  Id. (citing Scope Ruling at 5).  Consequently, the Government suggests, Commerce did not conclude that glycine slurry is the only precursor subject to the Orders; rather, the Scope Ruling "leaves open the possibility for other products which require fewer production steps to yield dried crystalline glycine to be considered precursors."  Id.

Next, the Government addresses Deer Park's contention that Commerce failed to adequately compare the merchandise to sodium glycinate, a substance that

is expressly included in the written description of the Orders. Id. at 13–15. With

respect to this point, the Government's position is that Deer Park waived any

arguments related to the relevance of sodium glycinate by not specifically raising

them in the Application. Id. at 14. According to the Government, if Deer Park

"believed the [Commission] Report and its discussion of sodium glycinate's

production process supported its position, it was required by Commerce's

regulations and the scope application questions to provide such information." Id.

(citing 19 C.F.R. § 351.225(c)(2)(vii)-(ix)). Instead, the Government contends, the

"lone statement" Deer Park provided as to the relevance of any similarity between

the merchandise and sodium glycinate is the Outlaw Declaration, which observes

that the two substances require the same manufacturing equipment to produce

glycine. Id. Accordingly, "Commerce had no reason or opportunity to consider the

production process of sodium glycinate as compared with calcium glycinate." Id. In

a similar vein, the Government adds, "the fact that Commerce cited a footnote in

the Commission Report that mentioned sodium glycinate did not mean that

Commerce was required to scrutinize the entirety of the report to determine

whether sodium glycinate bore any similarities to calcium glycinate." Id. at 15. To

summarize, the Government argues that Deer Park's assertions as to the relevance

of sodium glycinate, its chemical or functional similarities to the merchandise,

should have been raised in the Application. Id. at 13–15. Thus, according to the

Government, Deer Park waived arguments regarding sodium glycinate because it failed to articulate and support such arguments in the Application. Id. at 10–15.

Finally, the Government addresses Deer Park's procedural argument regarding the nature of Commerce's analysis of the plain language of the Orders and primary interpretive sources. Id. at 15–20. On this point, the Government contends that Deer Park mistakenly asserts that "Commerce is required to consider other primary interpretive sources," and that it failed to do so here. Id. at 17. The Government further clarifies that Deer Park improperly asks the court to consider several interpretive sources that were not included in the Application and, in turn, not specifically considered by Commerce in the Scope Ruling. Id. at 18–20.

Central to the Government's response to Deer Park on this point is the amended language of section 351.225(k)(1), which now refers to primary interpretive sources that "'may be taken into account . . . at the discretion of the Secretary.'" Id. at 17 (quoting § 351.225(k)(1)) (emphasis omitted). As the Government notes, Commerce focused on one enumerated primary interpretive source when it considered the Commission Report: "determinations of the Commission pertaining to the order at issue, including reports issued pursuant to the Commission's initial investigation." Id. (quoting § 351.225(k)(1)(i)(D)). In other words, the Government argues that Commerce reasonably limited its review to "the Orders' scope language and the [Commission] Report," instead of venturing further afield. Id. Still, the Government maintains that the additional interpretive

materials referenced by Deer Park are inapposite to Commerce's analysis: "None of these sources provide insight into the key question, which is whether calcium glycinate is either a form of glycine or a precursor of dried crystalline glycine. At most, they suggest other substances are within the scope, without explaining whether or how those substances relate to calcium glycinate." Id. at 20.

In sum, the Government responds to Deer Park by defending Commerce's analysis as reasonable in both its scope and its substance. In the Government's view, Commerce reasonably focused on the plain language of the Orders, including specifically the phrase "precursors of dried crystalline glycine," and supplemented that textual interpretation with certain information from the Commission Report.

### C.    Deer Park's Reply Brief

Deer Park's reply brief addresses the Government's arguments with three notable points: first, Commerce unreasonably cherry-picked from the Commission Report; second, Commerce's restrictive view of the term "precursor" would inexplicably exclude sodium glycinate, which is expressly included in the written description of the Orders; and third, Commerce ignored additional primary interpretive sources. Pl. Deer Park Reply Br. in Supp. of Mot. for J. on Agency R., ECF No. 26 (Sept. 3, 2024) ("Deer Park Reply Br.") at 7–14.

Deer Park's first response to the Government is simple: Commerce relied on a footnote in the Commission Report to conclude that glycine slurry is a precursor to dried crystalline glycine, but did not address that the same footnote indicated that

Court No. 23-00238                                                    Page 17

sodium glycinate is also a precursor of dried crystalline glycine.  Id. at 7–8 (citing

Commission Report at IV-1, n.4).  Thus, Deer Park emphasizes, just as the

Commission Report suggests, that glycine slurry's status as a precursor might be

relevant to Commerce's analysis of calcium glycinate, the Commission Report

likewise suggests that sodium glycinate's status as a precursor might be

noteworthy.  See id. at 8.  In addition, Deer Park highlights how Commerce either

overlooked or disregarded other information in the Commission Report that

suggested sodium glycinate and calcium glycinate are analogous for purposes of the

scope of the Orders.  See id.  Specifically, Deer Park again highlights a description

of how sodium glycinate yields glycine – i.e., through the introduction of sulfuric

acid, the obtainment of glycine slurry, and then "one or more crystallization and

filtration steps to produce a pure white glycine powder."  Id. (quoting Commission

Report at I-16).  "If Commerce properly considered the record evidence, it would

have reasonably concluded that calcium glycinate, like sodium glycinate, goes

through a few minor processes to first obtain glycine slurry, which is then

crystallized and filtered to obtain dried crystalline glycine."  Id.  In other words,

Deer Park contends that the Government provides inadequate legal basis for

Commerce's refusal to perform even a cursory review of pertinent information in the

Commission Report.  Id. at 7–9.  As one case cited by Deer Park observes, the

substantial evidence standard "must take into account whatever in the record fairly

detracts from its weight."  Id. at 9 (quoting CS Wind Vietnam Co. v. United States,

832 F.3d 1367, 1373 (Fed. Cir. 2016).  Thus, Deer Park maintains that Commerce

unreasonably disregarded information in the Commission Report that fairly

detracts from its chosen conclusion.  Deer Park Reply. Br. at 9.

Deer Park's second response to the Government, which relates to its first

point, is that Commerce chose an unreasonably limited view of the term "precursor"

that implies that precursors other than glycine slurry, such as sodium glycinate, are

beyond the scope of the Orders.  Id. at 9.  As Deer Park explains, Commerce found

that it was the "multiple production processes" separating calcium glycinate from

dried crystalline glycine that suggested the merchandise is beyond the scope of the

Orders.  Id. at 10–11.  However, given the close similarity in the processes by which

sodium glycinate and calcium glycinate yield dried crystalline glycine, Commerce's

reasoning suggests that sodium glycinate is likewise outside of the scope of the

Orders.  See id. at 10. Compare Commission Report at I-16, with Outlaw

Declaration.  Yet as Deer Park emphasizes, the express inclusion of sodium

glycinate in the written description of the Orders and the Commission Report

footnote cited by Commerce makes clear that sodium glycinate is both within the

scope of the Orders and no less a precursor of dried crystalline glycine than glycine

slurry.  Deer Park Reply Br. at 9–11.  Thus, according to Deer Park, by deploying

faulty reasoning with respect to the relationship between glycine slurry and calcium

glycinate, Commerce unlawfully changed the scope of the Orders to exclude

substances, like sodium glycinate, contemplated by the Orders.  Id. at 11 (quoting

<u>Eckstrom Indus., Inc. v. United States</u>, 254 F.3d 1068, 1072 (Fed. Cir. 2001)

("Commerce cannot interpret an antidumping order so as to change the scope of that

order, nor can Commerce interpret an order in a manner contrary to its terms.")

       In its final response to the Government, Deer Park reiterates its view that

Commerce should have considered additional interpretive sources to help clarify its

view on calcium glycinate. Deer Park Reply Br. at 12–14. The additional sources

Deer Park highlights include the original petition that gave rise to the Orders, a

circumvention determination concerning glycine from China, and a scope ruling

concerning glycine from China that Deer Park contends "has similar scope

language." <u>Id.</u> at 13–14. Aside from characterizing these sources as primary

interpretive sources under subsection 351.225(k)(1)(i) and emphasizing their

substantive relevance, Deer Park does not address or otherwise challenge the

discretionary nature of that subsection's amended language. <u>Id.</u>; <u>see also</u>

§ 351.225(k)(1)(i) ("The following interpretive sources may be taken into account . . .

at the discretion of the Secretary . . . ."). Nevertheless, Deer Park maintains that

the Commission Report "itself was sufficient to alert Commerce that the term

'precursor' as used in the scope language covers not only glycine slurry but other

materials, such as sodium glycinate, that are obtained one step before the creation

of glycine slurry in the glycine production processes." Deer Park Reply Br. at 14. In

other words, while Deer Park suggests Commerce should have considered

additional primary interpretive sources, and that doing so would have lent support

for the conclusion that the Orders cover the merchandise, Deer Park agrees that the sufficiency of Commerce's analysis can be determined by scrutinizing its approach to the plain language of the Orders and its consideration of the Commission Report.

## II.    Legal Standard

When questions arise as to whether merchandise is covered by the scope of an antidumping order, Commerce will conduct a scope inquiry and issue a scope ruling. 19 C.F.R. § 351.225(a) (2024).  Commerce has broad authority in interpreting its own antidumping orders.  <u>Tak Fat Trading Co. v. United States</u>, 396 F.3d 1378, 1382 (Fed. Cir. 2005).  In determining whether a product falls within the scope of such an order, Commerce considers "the language of the scope and may make its determination on this basis alone if the language of the scope, including descriptions of merchandise expressly excluded from the scope, is dispositive." § 351.225(k)(1).  "If the scope is unambiguous, it governs."  <u>Meridian Prods., LLC v. United States</u>, 851 F.3d 1375, 1381 (Fed. Cir. 2017).

"In reviewing the plain language of a duty order," Commerce considers (k)(1) sources to resolve ambiguities.  § 351.225(k); <u>see</u> <u>Meridian</u>, 851 F.3d at 1382.  These sources include descriptions of the merchandise considered by Commerce and the Commission when crafting the scope, as well as previous determinations made by Commerce and the Commission.  § 351.225(k)(1)(i); <u>see</u> <u>Meridian</u>, 851 F.3d at 1382.

If Commerce "determines that the sources under paragraph (k)(1) of this section are not dispositive," Commerce will then consider the (k)(2) factors.

§ 351.225(k)(2)(i).  Thus, the (k)(1) sources help Commerce interpret ambiguous

scope language, while the (k)(2) factors help Commerce clarify if the language

describes the product at issue.  All of Commerce's analysis, however, must be done

in such a way that the scope is not changed, and that the order is not interpreted in

a manner contrary to its terms.  E.g. Eckstrom Indus., Inc., 254 F.3d at 1072.

The plain meaning of an antidumping order is a question of law, while the

question of whether certain merchandise falls within the scope of such an order is a

question of fact reviewed for substantial evidence.  See Worldwide Door

Components, Inc. v. United States, 119 F.4th 959, 968 (Fed. Cir. 2024) (citing

Meridian, 851 F.3d at 1382).  Substantial evidence is any relevant evidence that one

might reasonably accept as adequate to support a conclusion.  See Worldwide Door

Components, 119 F.4th at 968.  In the context of a scope ruling issued by

Commerce, substantial evidence review is limited to the administrative record in

the proceeding before Commerce, including any relevant evidence therein.  See id.

Commerce's conclusion may be supported by substantial evidence even if it is

possible to draw two inconsistent conclusions from the record evidence.  See id.

III.    Remand is necessary to correct two interpretive failures by Commerce.

A.    Commerce acted unreasonably by failing to analyze whether the
merchandise is a form of crude or technical glycine.

As with any scope inquiry, Commerce began its analysis in the Scope Ruling

with the written description of the Orders.  As Commerce explained, the Orders

cover "glycine at any purity level or grade," a catch-all that is clarified as follows:

> This includes glycine of all purity levels, which covers **all forms of crude or technical glycine including, but not limited to, sodium glycinate, glycine slurry and any other forms of amino acetic acid or glycine.** Subject merchandise also includes glycine and **precursors of dried crystalline glycine that are processed in a third country**, including, but not limited to, refining or any other processing that would not otherwise remove the merchandise from the scope of these Orders if performed in the country of manufacture of the in-scope glycine or precursors of dried crystalline glycine.

Scope Ruling at 2 (emphasis added); see Orders.  Commerce focused its analysis on

the second sentence above, specifically the phrase "precursors of dried crystalline

glycine," presumably because the Application had described the merchandise as a

"precursor used in the manufacture of glycine."  Compare id., with Application at 6.

Of course, it was reasonable for Commerce to consider whether a precursor

used in the manufacture of glycine is also a precursor of dried crystalline glycine.

The difficulty with Commerce's textual analysis here is that the meaning of

"precursors" appears to have been its only focus.  After reciting the above language

from the written scope description, Commerce's first interpretive conclusion was

that glycine slurry is glycine in non-crystalline form and is a precursor of dried

crystalline glycine.  Scope Ruling at 4.  Then, upon citing the Outlaw Declaration,

Commerce observed that the Application "describes calcium glycinate as a precursor

of glycine but not as glycine itself."  Id.  From here, Commerce found that because

calcium glycinate requires "multiple production processes" to become dried crystalline glycine, "calcium glycinate is a non-scope input used in the production of glycine slurry and glycine slurry is a precursor of dried crystalline glycine." Id. at 5.

Separate and apart from whether the above analysis holds water on its own terms, Commerce's chosen interpretive approach was at best incomplete. Most glaringly, Commerce skipped the first category described in the Orders: "all forms of crude or technical glycine, including, but not limited to, sodium glycinate, glycine slurry and any other forms of amino acetic acid or glycine." Scope Ruling at 2. Oddly, Commerce quoted this language, but then set it aside to focus on how glycine slurry is a precursor to dried crystalline glycine. This was unreasonable.

The written description of the Orders presents several interpretive questions, none of which Commerce addressed in the Scope Ruling. Despite its discussion of precursors, glycine slurry, and dried crystalline glycine, Commerce failed to consider several related issues presented by the plain language of the scope description. Commerce provides no analysis regarding what constitutes "crude or technical glycine," the nature of sodium glycinate, the meaning of "all other forms of amino acetic acid," the extent to which these substances different than glycine slurry and dried crystalline glycine, and how any similarities or differences between the merchandise and these items referenced in the scope language inform Commerce's assessment of scope. Commerce neither tackled these questions nor explained its refusal to do so. Indeed, even reliance on Deer Park's characterization

Court No. 23-00238                                                                 Page 24

of the merchandise as a "precursor of glycine" in the Application is no excuse for

Commerce's limited interpretive effort.  As the Federal Circuit stated in <u>Meridian</u>:

> Although a party's description of merchandise in these sources may aid
> Commerce in making its determination, that description cannot
> substitute for language in the order itself because it is the responsibility
> of Commerce, not those who participated in the proceedings, to
> determine the scope . . . .

851 F.3d at 1382 (internal quotations omitted).  Thus, contrary to the Government's

attempt to repair Commerce's cursory textual analysis, it was unreasonable for

Commerce to disregard entire portions of the written description of the Orders in

favor of focusing solely on the phrase "precursors of dried crystalline glycine."

Of course, in its analysis of that phrase, Commerce did compare calcium

glycinate, glycine slurry, and dried crystalline glycine.  In doing so, Commerce

rightly sought to understand the relationship between these substances based on

the record evidence.  But Commerce's effort to analyze the relationship between

these substances accentuates its failure to perform a similar analysis concerning

crude or technical glycine, sodium glycinate, and amino acetic acid – whether in

general, in relation to each other, or in relation to calcium glycinate.

It is necessary for Commerce to consider the category of "all forms of crude or

technical glycine" in no small part because this part of the written description

appears to be phrased quite broadly.  In addition to the initial catch-all description,

which Commerce declined to discuss, the category contemplates a non-exhaustive

list of examples ("***including, but not limited to***"), suggesting the Orders encompass

more than a limited set of glycine's various "forms."  Similarly, the illustrative list of forms of crude or technical glycine ("***sodium glycinate, glycine slurry and any other forms of amino acetic acid or glycine***") suggests the breadth of these Orders. Without consideration of the plain language contained in this second sentence of the written scope description, Commerce's analysis appears to be predicated entirely on language contained in the third sentence, which on its face does not apply to Deer Park's merchandise but rather applies to "goods processed in a third country."  In any event, what matters here is that Commerce wholly ignored these important parts of the written description of the Orders and the interpretive questions they raise.[1]  Despite the precursor-related analysis Commerce did perform, remand is necessary to ensure Commerce addresses the full written description of the Orders.

> **B.      Commerce acted unreasonably by failing to consider information in the Application and Commission Report that undermine its conclusion.**

Deer Park also challenges Commerce's approach to the term "precursor" and how calcium glycinate, glycine slurry, and dried crystalline glycine relate to each other within the language of the Orders.  Although Commerce devoted the bulk of

---

[1] In a recent decision, this court reminded Commerce of its obligation to perform a careful textual analysis and not to overlook key interpretive questions.  See Hardware Resources, Inc. v. United States, 744 F. Supp. 3d 1385, 1366 (CIT 2024) ("Commerce's regulation contemplates that it give thorough and fair consideration to the 'language of the scope,' 19 C.F.R. § 351.225(k)(1), in deciding whether certain merchandise is within the scope of an order.  Commerce failed to do so here.")

the Scope Ruling analysis to these issues, aspects of its handling of relevant

information in the Application and the Commission Report were unreasonable.

Commerce's approach to the information in the Application was unreasonable

in a few respects.  First, Commerce observed that in the Application, Deer Park

"describe[d] calcium glycinate as a precursor of glycine but not as glycine itself."

Scope Ruling at 4.  Although Commerce did not include a citation to support this

characterization, context suggests Commerce had in mind the following:

> Calcium glycinate is the result of the chelation of calcium and glycine.
> Glycine can be retrieved from calcium glycinate when the product is
> deconstructed, as described in [the Outlaw Declaration].  Thus, when
> used in the production of glycine, calcium glycinate is a precursor of
> glycine.

Application at 6 (citing Outlaw Declaration).  Even if Commerce had cited the above

response, it did not provide any reasoning to support its view that, for purposes of

the scope of the Orders, a precursor of glycine cannot be glycine.  More importantly,

in referencing this response, Commerce did not attempt to compare the phrase used

in the Orders ("precursors of dried crystalline glycine"), and the distinct phrases

used by Deer Park ("precursor of glycine" and "used as a precursor in the

manufacture of glycine").  Compare Orders, with Application at 6.  Indeed, the

Application suggested both that calcium glycinate contains glycine and that glycine

"can be retrieved from calcium glycinate when the product is deconstructed."

Application at 6.  And yet Commerce concluded, without explanation, that this must

mean calcium glycinate is not glycine without noting whether glycine referred to

forms of crude or technical glycine, dried crystalline glycine, both, or neither.

Commerce acted unreasonably by drawing an interpretive conclusion –

namely, that a precursor of glycine cannot qualify as a form of glycine under the

written description of the Orders – without any elaboration.  Commerce appeared to

rely on Deer Park's characterizations, which were not obviously rooted in the

language of the Orders, as a substitute for performing a more basic and methodical

interpretive exercise of its own.  Indeed, if Commerce intended to convey its view

that because calcium glycinate is a "precursor of glycine" it may not also be

considered a "form of crude or technical glycine" under the Orders, it needed to

make this point more clearly and provide reasonable support for it.  In the Scope

Ruling, Commerce failed to do so, rendering one of its key conclusions unsupported.

Commerce was likewise unreasonable in reaching another conclusion

regarding Deer Park's characterization of calcium glycinate as a "precursor of

glycine."  Paradoxically, Commerce appeared to rely on this statement, or otherwise

disregard it, in finding that calcium glycinate is not a precursor of dried crystalline

glycine within the terms of the Orders.  Relying on the Outlaw Declaration,

Commerce reasoned that "production of glycine from calcium glycinate begins with

turning calcium glycinate into wet glycine slurry and subsequently drying it into a

crystallized form." Scope Ruling at 4 (citing Outlaw Declaration).  In discussing

this process, Commerce included the full description of it from the Outlaw

Declaration, which explained how glycine is obtained from calcium glycinate by adding water and sulfuric acid and then performing filtration and crystallization processes.  Id.  Based on this description, Commerce reasoned that calcium glycinate was not a precursor of dried crystalline glycine, but rather a precursor of glycine slurry.  Id.  Yet in doing so, Commerce obscures how the Outlaw Declaration neither mentioned glycine slurry nor distinguished between a precursor of glycine slurry and a precursor of dried crystalline glycine.

Commerce also failed to address the extent to which its previous observation – that calcium glycinate is a precursor of glycine – bears on the question of whether calcium glycinate is a precursor of dried crystalline glycine.  Taken as a whole, this discussion of the questionnaire responses and the Outlaw Declaration, particularly as a basis for concluding that calcium glycinate is "a non-scope input used in the production of glycine slurry," is incoherent and inadequately supported.  Ultimately, Commerce failed both to explain why it believed information in the Application supported its conclusions and to address the extent to which that information might undermine those conclusions.  Clarification is necessary.

Regarding the Commission Report, the deficiency in Commerce's analysis is simpler.  As the parties' briefing addresses, Commerce cited a specific footnote in the Commission Report in support of its observation that glycine slurry is a precursor of dried crystalline glycine.  Scope Ruling at 4.  Given this is the only

proposition in support of which Commerce relied on the Commission Report,

Commerce's use of this interpretive source was unreasonable in its selectiveness.

Peculiar though it is that Commerce relegated the Commission Report to

citations and provided no meaningful discussion of its interpretive significance, the

more critical deficiency in Commerce's use of the Commission Report is how it

disregarded large swaths of relevant information that might undermine or

complicate its analysis. As Deer Park persuasively argues, Commerce cited a

footnote in the Commission Report for the proposition that glycine slurry is a

precursor of dried crystalline glycine while disregarding how the same sentence in

that footnote also describes sodium glycinate as a precursor to dried crystalline

glycine. See, e.g., Deer Park Br. at 7 (citing Commission Report at IV-1, n.4). Even

if one charitably assumes that Commerce focused on glycine slurry here because it

is the intermediate link in the production process between calcium glycinate and

dried crystalline glycine, this Commission Report footnote raises important

questions that Commerce ignored. Perhaps most notably: If sodium glycinate is

also a precursor to dried crystalline glycine, how does that substance compare with

glycine slurry and calcium glycinate? And relatedly: Does the Commission Report

provide additional insights into the nature of these substances?

Simply put, Commerce pulled a single insight from the Commission Report

while inexplicably ignoring other pertinent information therein. As an initial

matter, it is difficult to understand how Commerce could have read footnote 4 in the

Commission Report and concluded, without elaboration, that only glycine slurry's status as a precursor of dried crystalline glycine is significant when the footnote draws no distinction between glycine slurry and sodium glycinate and both substances are expressly included in the written description of the Orders.  It is also confusing that Commerce would extract only one citation from the Commission Report when other portions of that document appear relevant to the Application. For example, in its briefing, Deer Park highlights a description of how glycine is retrieved from sodium glycinate, which appears elsewhere in the Commission Report, and observes similarities between that description of the calcium glycinate production process in the Outlaw Declaration.  See Deer Park Br. at 9.  Compare Commission Report at I-16, with Outlaw Declaration.  Yet this comparison, while persuasive, merely illustrates the many potentially relevant insights Commerce could have pulled from the Commission Report that it did not address.  Despite possessing latitude in the way that it analyzes (k)(1) sources, Commerce may not disregard entire swaths of record evidence and simply pluck the isolated tidbits that it prefers.  Indeed, the single Commission Report citation chosen by Commerce suggests Commerce either did not read the entire document or chose to pull from it only information that supported its preferred conclusion.  In sum, it was reasonable for Commerce to determine that the Commission Report was the critical (k)(1) source in this inquiry, but it was unreasonable for Commerce to consider only one part of one footnote of that source while ignoring relevant information therein.

### C.    The parties' remaining arguments concerning additional primary interpretive sources and waiver are inapposite.

Although the court has identified the deficiencies in the Scope Ruling that warrant remand, each party raised additional arguments that bear addressing.  In support of its motion, Deer Park asks the court to require Commerce to supplement the administrative record on remand.  <u>See</u> Deer Park Br. at 18.  Specifically, Deer Park wants the court to instruct Commerce to scrutinize additional (k)(1) sources beyond the Commission Report, such as the petition from the original glycine investigations and a prior scope ruling that it believes is comparable to the one at issue here.  <u>Id.</u> at 17–18.  Although Deer Park argues persuasively for the general relevance of these sources to the interpretive inquiry here, its argument does not overcome the flexibility afforded to Commerce by the amended language subsection (k)(1)(i).  <u>See</u> 19 C.F.R. § 351.225(k)(1)(i) ("The following primary interpretive sources <u>may</u> be taken into account . . . at the discretion of the Secretary . . . ."); <u>see also</u> <u>id.</u> § 351.225(k)(2)(i) ("If the Secretary determines the sources under paragraph (k)(1) are not dispositive, the Secretary will then further consider the following factors . . . .")  As amended, subsection (k) requires that Commerce perform (k)(1) analysis in the face of ambiguous scope language before moving to (k)(2) factors, but the regulation leaves Commerce some discretion in how it approaches the primary interpretive sources enumerated in paragraph (k)(1)(i).  <u>See</u> <u>id.</u> § 351.225(k).  As was true before the regulation's amendment, the touchstone is whether Commerce's

approach to its (k)(1) source analysis is supported by substantial evidence and reasonable.  Deer Park has not persuaded the court that it was unreasonable for Commerce to privilege the Commission Report over other primary interpretive sources.  Of course, whether it is reasonable to focus on one (k)(1) source at the expense of others does not bear on whether Commerce's treatment of that source was supported by substantial evidence.  Thus, even if on remand Commerce continues to prioritize the plain language of the Orders and the Commission Report, it must correct its analysis and consider whether other sources help it do so.

The Government, meanwhile, advances the theory that Deer Park waived or otherwise exhausted certain arguments that appear in its briefing but were not previously included in the Application.  Gov. Br. at 10.  Specifically, the Government focuses on Deer Park's citation to dictionary definitions of the term precursor, as well as Deer Park's argument that Commerce failed to look beyond its citation to the Commission Report and consider other relevant information in that source.  Id. at 10–11.  The Government's view here is that Deer Park should not be permitted to make arguments related to dictionary definitions and the Commission Report because it did not cite such information in the Application.  See id. at 10–14.

Before addressing the substance of the Government's points regarding Deer Park's dictionary and Commission Report citations, the court observes that the Government fails to raise this exhaustion of remedies argument with sufficient clarity.  Most importantly, the Government's brief does not establish that the

exhaustion of remedies doctrine is in fact applicable to scope inquiries and, more specifically, a scenario in which a scope applicant fails to develop fulsome legal arguments in its questionnaire responses. Because the Government does not articulate this argument with precision or nuance, the court finds it unpersuasive.

At a more basic level, and even if viewed charitably, the Government's exhaustion argument strains credulity for several reasons. First, as Commerce's regulations make clear, Deer Park was not required to treat the Application, and specifically the questionnaire responses, like a legal brief. Rather, as the Government's argument acknowledges, the Application must contain "factual information supporting the applicant's position." See Gov. Br. at 10 (citing §§ 351.225(c)(2)(viii)–(ix), (k)(1)(ii)). Second, the nature of the information to which the Government objects suggests that its objections are specious at best. Deer Park most prominently cites two popular dictionary definitions of the term "precursor," on the one hand, and excerpts of the Commission Report that relate to the footnote cited by Commerce, on the other hand. Deer Park Br. at 8–9. It is somewhat bizarre to contend that citations to basic dictionary definitions and the same interpretive source consulted by Commerce represent post hoc rationalizations or unfair surprises. Indeed, the logic of the Government's argument here implies that in analyzing scope language and record evidence, Commerce need only read the Application, sprinkle in its preferred citations, state its preferred conclusions, and call it a day. No matter whether Deer Park included dictionary definitions or a

selection of excerpts from the Commission Report in the Application, the Government's muddled exhaustion-waiver argument fails to justify Commerce's refusal to independently consult dictionaries and insightful information in the Commission Report. Ironically, this argument underscores Commerce's failures.

Finally, the Government's argument appears to conflate the principles of exhaustion of remedies, on the one hand, and waiver of legal arguments, on the other hand. As a matter of both administrative procedure and litigation practice, it should be apparent to the Government that Deer Park neither failed to exhaust administrative remedies during the scope inquiry nor waived legal arguments. After submitting the Application, and absent interested party comments, Deer Park's next opportunity to critique the Scope Ruling was this litigation.

## CONCLUSION AND ORDER

Whether calcium glycinate qualifies as a form of crude or technical glycine or a precursor of dried crystalline glycine is the critical textual inquiry at the heart of Deer Park's scope inquiry and the analysis Commerce purported to perform. In concluding that the merchandise is not a precursor of dried crystalline glycine, Commerce seemed to impliedly determine that it is also not a form of crude or technical glycine and that a principled distinction exists between calcium glycinate and precursors of dried crystalline glycine, such as glycine slurry and sodium glycinate, that are expressly included in the written description of the Orders. The pivotal and problematic word, however, is *impliedly*. Commerce did not address

whether calcium glycinate falls within the ostensibly broad textual category of "all forms of crude or technical glycine, including, but not limited to, sodium glycinate, glycine slurry and any other forms of amino acetic acid or glycine."  Even a cursory interpretive inquiry would have prompted certain questions, such as whether it is fair to describe the merchandise as crude or technical glycine or a form of amino acetic acid, and whether the merchandise is bears any similarities to sodium glycinate or glycine slurry.  Instead of considering these types of questions, Commerce jumped to the phrase "precursors of dried crystalline glycine," an interpretive focal point apparently derived from Deer Park's description of the merchandise as a "precursor used in the manufacture of glycine."  But no matter how it identified that textual hook, Commerce's analysis of this term was deficient.

Commerce's approach to its consideration of relevant information in the Application and the Commission Report was similarly unreasonable.  Without explanation, Commerce rooted its understanding of the term precursor in the Commission Report's description of glycine slurry while disregarding how the Commission Report and portions of the Application, such as the Outlaw Declaration, explain the relationship between calcium glycinate, sodium glycinate, glycine slurry, and dried crystalline glycine.  Simply put, the materials on which Commerce claimed to rely, at minimum, raise questions about whether calcium glycinate is analogous to the chemical substances (other than glycine slurry) that are expressly included in the Orders' text.  Commerce must reconcile that tension.

Court No. 23-00238                                                      Page 36

By performing no analysis of the category of "all forms of crude or technical glycine" and a selective analysis of the category of "precursors of dried crystalline glycine," Commerce contravened its obligations under section 351.225(k) and issued a Scope Ruling that is unreasonable and unsupported by substantial evidence. Therefore, upon consideration of all papers and proceedings herein, it is hereby

**ORDERED** that Commerce, within 90 days from the date of issuance of this Opinion and Order, shall submit a redetermination upon remand ("Remand Redetermination") that complies with this Opinion and Order; it is further

**ORDERED** that defendant shall supplement the administrative record with any information considered by Commerce in reaching the decision in the Remand Redetermination within 14 days of the Remand Determination; it is further

**ORDERED** that subsequent proceedings shall be governed by USCIT Rule 56.2(h); and it is further

**ORDERED** that the parties shall file the joint appendix within 14 days after the filing of replies to the comments on the Remand Redetermination.

/s/     Joseph A. Laroski, Jr.
Joseph A. Laroski, Jr., Judge

Dated: April 10, 2025
         New York, New York